My first case up this morning is Sanner v. Sanner Farms, Inc. For the appellant is William McNutt. You are he, sir? Correct. For the appellee, Mark Jackson. You are he? Yes, sir. Okay. Mr. McNutt. This is case number 412-0809. Mr. McNutt, you may proceed, sir. Your Honors, I represent the plaintiff in this case, Mr. Sanner. I'm here on his behalf, and I have my co-counsel, Mr. Johnson, who is sitting in the first row of the visitor's section, although only I will be arguing. We come before the Court today citing two Supreme Court cases, Continental Casualty v. Bertucci and Rich v. Principal Life Insurance Company, for the proposition that when interpreting a contract, the Court must take into account all parts of the agreement and not just focus on a little section of the agreement and come up with a result. In this case, the trial court chose to look at just the first part of paragraph 1 of the agreement, and in that first part, it found a promise to pay $300,000 for the stock at 11% interest over 30 installments. It then found that subparagraphs A, B, and C allowed those installments to be reduced, and it declared that since there was no differentiation between reducing the first installment and reducing the last installment, therefore nothing else was due at the end. But the Court should have gone on in its review of this contract and looked at paragraph 1D, which follows A, B, and C, and there that paragraph explains what happens when the installment is reduced under A, B, and C. And the result is a chart must be created, and it's called the Schedule of Payments and Allergies. That's a Schedule B, and it says in the event the defendant reduces an installment, then the effect has to be accounted for and a Schedule of Allergies is created. Now, once we look at paragraph 1D, then we need to come back and look at paragraph 1A, B, and C, and, Your Honor, that's what we do in the reply brief, but if you go to paragraph A, subparagraph 1A, it says that the cash basis net income as determined for income tax reporting by Santa for any fiscal year in which a payment is due is less than the standard payment provided in Schedule A. The standard payment provided in Schedule A, then the amount of that payment will be limited to the amount of such year's cash basis net income, and it continues the same provision in A, B, and C. So, in other words, the effect is this is not a reduction of the unqualified promise to pay money. It's a reduction in the standard payment in Schedule A, and then when that happens, there has to be an accounting made, and that's done on Schedule B. Now, and if we go through Schedule B, which is the last, there's a Schedule A attached, which is the standard payment, and then if we look at Schedule B, we see the corporation is required to determine what the actual payment is, and then it applies that payment, and if it's less than the standard amount, then it has to carry it over and make the calculations, and they end up in the arrearages column. So, there's nothing in Paragraph 1 that says anything about reducing the principal or interest because of profits, earnings, or cash available. It's a reduction only of the standard amount, and the effect of that reduction of the standard amount has to be accounted for on Schedule B, and then that is the amount that's owed at the end of the agreement. And the result, then, of course, is arrearages that must be paid, if not during the time of the agreement, then at the end of the agreement. Where, since we're looking at language, where does it say that? Where does it say that it has to be paid at the end? Yeah. This document was created by the president of the corporation. He was an accountant. He wasn't a lawyer. So, what he has done is he's created an agreement that's heavy in a chart and a graph, an accounting paper, and it's light on language, but it's clear if you look at it. Wait a minute. So, the answer is it doesn't say that? Well, the answer is this. This is my answer. There's an unqualified promise to pay. That's in the first paragraph. And then there's a Schedule B attached, and it has line 30. If you look at line 30, it says, that's the last year, it says what the arrearages are. So, certainly the implication is that that has to be paid. There's no provision in here that the arrearages disappear. But you're right. We don't have the language. A careful lawyer, if this was a lawyer creating this contract, he would say, if it was my next-door neighbor creating the contract, would say, you've got to pay me what you owe me at the end. Wouldn't even have to be a careful lawyer. Well, I think that you've got a careful accountant, and he has a Schedule B, and it shows, it's got the balloon payment at the end. Right. There's a case of Edstein that we cite in our brief that says, it's a Supreme Court case too, and it says that just because they don't say when it's due and the amount, if you can discern from the agreement when it's due and the amount, then that is still an enforceable agreement. How much do you assert is due? In the complaint, I think it is $1 million. So this is a million-dollar oversight in the construction of the contract? They just forgot to include that provision? The provision is in there, Your Honor. Well, I thought in answer to Justice Connacht, you indicated that this is more of a construction. There's no specific statement of what's to be paid at the end? What I'm conceding, Your Honor, is that there's, if you look at what lawyers, what I would do if I was, if I created the contract. No, I'm talking about the document as it speaks right now. The document before us doesn't contain a million-dollar payout at the end of the 30 years, does it? Yes, as Schedule A, it does. That's what was anticipated. Look at the total payment. They anticipated paying $734,940 in annual interest, and they anticipated $300,000 in principal. That's over a million dollars. Does the document say at the end of 30 years, a million dollars plus shall be paid? It doesn't say it won't be paid. See, I try to focus my questions carefully, counsel, and that call I stick for a yes or no answer. The words that the all accrued interest and unpaid principal are owed at the end, those specific words are not in this agreement. I agree with that. What construction should we give of the document in view of their absence? Why else create a religious? Why have interest on an amount that will never be paid? What we've done, what the trial court said is that this is an earned out agreement. It doesn't have any of the amnesia of an earned out agreement. What is an earned out agreement? That is limited to profits every year, so you'd have a target amount, and then you only have to pay the profits that you earn every year. And that's just not the case here. That's not because what I was trying to point out in the reply brief is that the trial court inferred that this A, B, and C limited the unqualified promise to pay, the $300,000 over 30 years at 11%. It doesn't say that. It only says, it's only directed to Schedule A. And Schedule A is, and what we have here, I submit, is we have a promise to pay according to Schedule A, but we're going to give the corporation a lot of flexibility, and if it doesn't pay according to Section A, it'll pay according to Section B. How much has been paid out over the years? That's in the record, it's over $200,000. But it was mostly all interest. The only principal that was paid was $1,900-something. So $200,000 has been paid over 30 years, and now a million is due? Right, and that was always going to be the case under Schedule A, and then if you calculated it out into Schedule B, it's a little bit more. It's a little bit more than what they projected because you have to adjust the interest because the principal didn't come down during the years. And that's exactly, to say this is an earned-out agreement, then you have to assume that when the corporation fails to make the standard of annual payment on Schedule A, it is then relieved of its obligation to pay any future sum of that difference. And then that's where the additional piece in this case comes up. We have the first, we have the cover letter that came with the contract sent to my client, and it says, this is from the author of this agreement, it says, I rearranged it to clarify that you will be paid interest on the unpaid principal balance if the payment should be less than standard. The interest on actual unpaid principal on Schedule, it says C, but it means B, would then supersede the standard interest payment. So that goes back to what I said earlier. He's saying in here, Steve, you will be paid interest even if our payments are lower than the standard amount. And what we're going to do is we're going to recalculate that interest off of Schedule A, move it over to Schedule B, and it has to be increased because we didn't make a full payment, so therefore the principal didn't come down. The principal can be just carried over if we miss a payment. But the interest has to be recalculated to be moved over, and that's exactly what he's saying in here, and that's exactly what he does in Schedule B as he keeps track of it over the years. You notice that the interest, the accrued interest, keeps going up. So he must be clear under this agreement he is keeping track of these arrearages for a reason. If this is an earned out agreement, there's no reason to keep track of arrearages. There's no reason to have an interest payment. And you have the promise with the contract itself. You will be paid, Steve, even if the payment is less than standard. The second year of the agreement, the author of the agreement sends what I call the trigger letter, which is the letter that was sent the following year with the next payment. That's Plainness Exhibit Number 34. It's in the appendix. And when he sends the payment, it's the first time that he doesn't make the full standard amount. And he says to Steve, he says, You're checked for $15,293 to apply on the regular payment due January 31st is enclosed. So this doesn't satisfy the payment. It applies on the payment. And he says, Since this is less than the standard, it is interest. And then he says, Triggers the terms of our agreement in Schedule B. As presented in Schedule B. So there must be an agreement then in Schedule B itself. And that's the arrearages. Because that's where the arrearages are. Why would you keep track of the arrearages if you didn't intend to pay them? And then it shows, he says, and then he goes on, he says, We're now in arrears to you in the amount of $17,541 of interest and $1,675 of principal. I've read Judge Little's various rulings and orders here. And it seems to me he shows a lot of scrutiny and care as he looked into this case. He disagreed with you. Where did he go wrong? By just focusing on paragraph 1A, B, and C. He didn't really look at 1D. 1D says, What's the effect? Doesn't he talk about it? No, he doesn't. He doesn't talk about it. He doesn't talk about the word arrearages. He didn't try to interpret why the agreement says you can prepay principal. He didn't address that. Because I think he read paragraphs 1A, B, and C and said that A, B, and C affect the unqualified promise to pay. What I argue, however, is that that's not what it's referring to. It's referring to the standard amount shown in Schedule A, which makes sense that if you reduce the standard amount, then you have to make a calculation to preserve that amount and show it in arrearages if you're ever going to pay it. You argued this to Judge Little? Yes. Yes, I don't know that I did it in those exact words, but yes, I did. Go ahead. And then the other thing that's remarkable about the trigger letter, you know, Judge Little does quote from his trigger letter in his opinion, and those very words, This triggers the terms of our agreement as presented in Schedule B. He quotes that section, but he never tried to interpret what is the agreement as presented in Schedule B, and that's the arrearages, and that's the amount that's due on line 30 at the end of 30 years, and you carry that over. There's no reason to have line 30 if this is limited. Under his view, there's no reason to have a line 30 because you're going to pay in year 30 whatever the cash basis net income allows. There's no reason to have the line 30 to carry it over to show the arrearages unless that's to be paid at the end, and that's totally consistent with the You Will Be Paid, Steve, You Will Be Paid letter and the trigger letter. In knowing that, the author, who's the president of the company, you'll see Exhibit Number 33, which is also in the brief, and he, every year, he sits here and he writes out the payments made and he adjusts and he carries it over to the arrearages, and if you notice here, if you look at the standard amount and the standard interest in Column 1 and then compare that with the interest that he's calculating in Column 7, you'll see that the interest goes up because you're not paying principal, so you've got to make that adjustment and create an arrearages. Why have an arrearages if you're not going to pay it? There's no reason to do this. So he's intending, James Q. Santer, the author of the agreement, is intending to pay that out at the end. Then if we go into Paragraph 2 of the agreement, that addresses the payment of principal and interest, and in those, James Santer in that provision uses words about prepayment. What's the standard of review in this case? Your brief doesn't set one forth, does it? I think it's de novo, but I think that even if it's not de novo, then if you look at all the evidence presented, the letters presented, what James Q. Santer did, look at the agreement, I think it's clearly against all the evidence. Well, we have a lot of testimony that was presented here, was it not? It was very limited testimony, Your Honor. I submit it was. We called the president of the company to, first of all, lay the foundation for that Exhibit 33, and then testify about the payments that were made, and that's all that we asked for. How about other witnesses? Well, there was an evidence deposition submitted, and that was the evidence. That counts? Yes, but of course you have that. That was presented in written form to the trial court, and you have it as well. Because the appellees discussed standard of review, and I don't believe you talked about one in your brief. I wanted to make sure what your position was. And I talked about? I don't think you talked about it in your brief, standard of review. In the brief we do at the beginning of Section 1 and 2, I do refer to the, and then at the end of the reply brief, Your Honor, I also address the standard of review, and they, because the defendant in its brief had mentioned, Go ahead. I'm sorry, it's at page 18 of the reply brief. It's also in the brief. They talked about the Shields court case, which was decided by this court, and I pointed out that in Shields court there were a whole bunch of witnesses, two expert witnesses, and there, of course, the standard of review was not de novo. But I argue that it should be de novo in this case. What percentage of the total shares did your client own back in 1982? It was roughly one-fifth. That's what he conveyed to the, they had, because they had brought out cousins Truman and Samuel, and then there was another cousin or uncle that had been bought out. And then I think there was originally five shareholders. One other point, Your Honor, regarding James Kusaner, as he's filling out this, again, you have to remember that the assumption is you make a payment in a year, and then the corporation does not have to make up the difference later. If he reported to the board of directors each year, and he reported the payoff figure, which included the unpaid principal and all the accrued interest, if the liability, if he viewed this as only a liability for earnings only, he would have taken the standard of payment, which was 34,509, multiplied it by the remaining years, and that's what he would have reported to the board as being the liability. He never did that. His figures always go up every year because they weren't making full payments. And again, I just repeat, Your Honor, that I think, of course, the court is really trying to figure out what was the intention of the parties. What did they really intend by this agreement? Well, I guess I, I mean, is it the number of witnesses that somehow changes the standard of review? No, Your Honor. Well, I mean, is it at all significant that there were negotiations and that this sale is different than the ones that your client sought? I mean, I want my deal to be like so-and-so's and so-and-so's, and then it's, you know, we're not going to do that because, look, we had to go into debt and we bought those out and we're repaying. I mean, does that mean, I don't know what it means, but that is evidence, isn't it? That was admitted into evidence. Well, how does it differ whether that comes in by way of documents and evidence deposition or whatever, whether somebody got on the stand and testified to it? Well, Your Honor, I submit to you all that evidence. Okay. And it does not infer that this is an earned-only agreement. It's the opposite. This agreement was an accrual of averages to be paid. Well, I understand that, but does that affect the standard of review? Well, all that evidence came in in documents. The defendant's evidence all came in in documents. But if that evidence speaks to intent or the relationship in bargaining between the parties is, I mean. But you're in just as good a position to review that evidence as the trial court was. Well, we always take that, but we're not. Okay. Thank you, Mr. McNutt. You'll get a chance to address us again in rebuttal. Mr. Jackson. May it please the Court. Counsel. What advantage is there to somebody who owns, if it's correct, approximately one-fifth of the shares, or one-fifth interest in this, to say, pay me when you can, and if you can't, then don't pay me at all? Why would anybody enter into that agreement? Well, I think that's an interesting question, and we need to look at this back in 1982 and not retroactively from here. The farm was in the process of paying off three other shareholders. There was Carl, who they took a loan out to pay off. And then there was Truman and Samuel, who they agreed to purchase their contract with an escrow agreement that had a pay on full clause on it before shares would leave. And at the time that they offered to purchase Samuel and Truman, they offered Steve. They asked Steve, do you want to sell your stock right now as well? And Steve elected not to. So if he sells his stock immediately. If he would have sold his stock at that time, presumably he would have received a similar deal as Sam and Truman. Now what the terms of that deal would have been if they were going to try to buy off all three at once, we don't know, because he didn't offer it. But at the time, the farm economy was low. They were paying dividends based on cash basis net income, which is our magic term in this agreement, or one of our terms of focus. And the cash basis net income varied from time to time. I think there were times when some of the shareholders were asked to make loans to the company in order to help pay off these other agreements. But was he one of the shareholders that was asked to pay off? He was asked to do that, and he decided he didn't want to do that. And how does that? I mean, before he sold his shares. No, that was before he sold his shares. And he said, I don't want to do that, and I'm not going to do that. But if you keep the shares, do you have to do that? Well, there was no requirement that you had to do it. But because that occurred, then there were some changes in officers and – As to who it was going to be. Yeah. The people that are willing to do that to keep it afloat. We are going to have a little bit more control of the company. But to answer your question, and I apologize for taking so long. I was going to make sure you got back on. Mr. Sanner was living in Texas at the time. He wasn't making much money. He said in his evidence deposition, I didn't really have a whole lot of good options, in his opinion. And I thought, if I get all the cash basis net income for this company for 30 years, I'm going to roll with it. So, in effect, this contract was to give him all of the income for this farm for 30 years. So it was a gamble. It was. There was risk. And he knew the risk because he immediately saw 1A, B, and C come through with that first draft of the contract. And he said, this isn't in my favor. I want him removed. And the negotiations, which are part of the documentary evidence and part of the evidence deposition, which you have seen and which Judge Little made rulings on, is all relevant in that. With regard to Judge Little, we rely a lot on this appeal on Judge Little's order. Judge Little looked at this very carefully and thoroughly. And he repeated the plaintiff's position in this. He told that their position was that there was supposed to be this meticulous record kept and what the you will be paid letter said. He made reference to that. He said, you know, if the evidence stopped there, I might feel like going with the plaintiff. But he said there's a lot more evidence to look at to determine the intent of the parties. And he made findings. Well, you heard Mr. McNutt indicate that Judge Little didn't address the argument he made. I think that's wrong. I think he did address it. And Judge Little, Your Honor, has heard this on four separate disputed occasions where we have harangued about 1A, B, and C and 1D four times. We filed a 2619 motion to dismiss this. Lucky Judge Little. And he made references and rulings there. He heard a summary judgment ruling and heard the same arguments here. And those briefs are in the file. We sort of tried to struggle to figure out a different way to say it. But then he heard a motion to reconsider. And then he heard the trial. And after all of that, I'm biased, I think Judge Little nailed it. And if the standard of review is 100% against the manifest way of the evidence, I don't walk in here feeling really darn confident because there is evidence to support every finding he made. And the contract language is supported by every finding he made. There is only one provision in this contract that requires payment. Only one. And that is in 1A. One. I mean Section 1. 1A, B, and C. And it talks about 30 installments. It defines what those installments will be as a standard amount. And then it says however. And then it limits it to the income. And that was the deal. Steve was going to get the cash basis net income for 30 years. He's going to get it. Cash basis net income. Period. That's the limitation on the payments. He gets the cash basis net income for 30 years or the standard amount, whichever is greater, each year. There's 30 installments. Now what would he get? Let's suppose he hadn't sold his shares. What would he have been getting each year? He would have received a third. There would have been three shareholders left. Roughly a third. They said a fifth. The other stock, but it's between a third and a fifth. Of what? Of the company. They would have given dividends equal to the cash basis net income, I assume. Which was what? Over the years, $280,000 plus. And that's in the record. Oddly enough, the cash basis net income could have been $560,000. And it would not have made one effect one way or the other on the other two shareholders. Steve would have gotten it all. But he gets the cash basis net income for 30 years. And then it's done. Everybody agrees there's 30 payments. And the contract says that it makes no distinction between the 30th payment and the other 29 payments. Let me ask you this question, Mr. Jackson, because it might help me understand your earlier comment to Justice Connect about how Steve took a gamble here. It appears your position is he took a gamble, and things are a lot better for farms now than they were then, and maybe in retrospect this didn't pay off so well for him. From the viewpoint of 1982, what was the gamble he was taking that 30 years later might have worked out badly, where things would have lost, where the system of these 30-year payouts, as you described it, that would have been a hell of a deal. There are a lot of factors that go into the farm income, the farm economy. And he had been a shareholder since 1960, or since the corporation was formed. So he's very familiar with all this. He was familiar with it for 20-plus years. He knew what was going on. He knew about these prior deals because he was on the committees that helped put them together and formed the contracts. And he signed the Salmon Truman contract. He was there for 20 years. He knew what this farm was doing and what it was not doing. And there were times in those 20 years, and this is in the minutes, these are in exhibits. It's documentary evidence. One of the problems we have here is James Santer, who negotiated this, died. And we can't tap him any more than what the documents say. But Steve knew and a couple of times had requested to have his shares bought out. But then he would change his mind and say, no, I don't want to do that. He was requesting before 82 to have his shares bought out? Oh, yeah. He requested way early, before Salmon Truman's contract. He might have even requested before Carl's. There was one real early time when he wrote a letter, and it was at a time when James was concerned about estate tax things. They'd done a special use valuation. He didn't want to risk messing that up with a sale at that time. So they put that off, but then Steve sort of went on his way. But you've summarized his deal exactly. There was some risk here. It may pay off and it may not. No one knew there was going to be droughts in the 80s and that the farm economy would tank. But everybody knew that how much he gets depends on the farm income, and he knew that we also had the Salmon Truman contract going, and he also knew that we had this Carl contract going. He knew all of that when he took the risk. He didn't want to do it, but he decided, I'm going to do it. I don't have a lot of good options. I'm not getting that much anyway. Let me ask you this also. You heard Mr. Jackson, or Mr. McNutt rather, allude to the fact that, well, we've got accountants drafting this stuff, we didn't have lawyers, and it's not as carefully done as perhaps it should have. You made reference to the fact that apparently there was an awful lot of negotiating going on and contracts being prepared with regard to the others. Were lawyers involved in any of that? Not to my knowledge. These are all just these farmers and accountants doing their thing. Jameson is an accountant doing his thing, and I don't know that he used an attorney. And from the other side's point of view, maybe the contract could have been better, and even from our point of view it could have been better, but it's not that bad. It says what it says, and that's what we're very – I think Justice Connex said, where does it say that you pay everything at the end? It doesn't. Is that a difference between this and the Sam and Truman contract? Yes. And in the Sam and Truman contract, it says upon payment in full, and it's in Exhibit 19, has the cross-out. That's a contract he – our accountant. Explain that again. James used the Sam and Truman contract to prepare this one, and he crossed out stuff. Who's he? James. James crossed out stuff, and this is the one that Steve was on the committee for and signed. James crossed out stuff that wasn't going to apply to the deal they were going to offer Steve, and then he added 1A, B, and C. And one of the things he crossed out was payment in full? Yes, I think it's Paragraph 3. I happen to have that right here. I think it's Paragraph 3. He renumbered it 5, but it says upon full and final payment of all installments. Full and final. These were fixed payments. These were not contingent payments. The amounts were not contingent. They were fixed. Upon full and final payment of all installments due here under the Samuel and Truman, the escrow agent shall deliver the certificates and so forth. But there was full and final payment. And the payments were fixed. That language was in the contract for whom? Sam and Truman. And it's in Exhibit 19. So those payments have absolutely nothing to do with profit. That's right. They were fixed payments. There was no contingency. Was Steve part of this board that negotiated those? Not only that, he signed it. We have spent a lot of time, probably too much time in our brief, trying to say what each of these provisions say and don't say. And I can't say them any better here than what we did in our brief, and so we'll rely on our brief. But we also think very little has said it even better than we could say it. And so we commend his order for your careful consideration because we think after hearing this four different times, Judge Little is in a good position to make the findings that he made. Thank you, Counsel. Mr. McNutson? Your Honor, the defendant still does not respond to why there's a Schedule B and a showing of arrearages. He points to the Truman contract, the Truman and Samuel contract. Why isn't the answer to that? Because the fellow's an accountant. That's the way he likes to keep track of stuff. But he's not keeping track of what he's not going to owe. There's no logic to an accountant keeping track of a sum that he's never going to have to pay. He's keeping track of that sum, and he's reporting it to the board because that's part of this unqualified promise to pay, and that amount has to be paid by the end of the agreement. Well, how do you compare the unqualified promise to pay that doesn't quite exist in words in your contract versus the Sam and Truman where Mr. Jackson is telling us, If you look at that, there isn't any doubt because they're fixed payments, and they're due. Well, in final payment language, as you just sort of mentioned. But his final payment said, upon final payment, direction to the escrow agent to release the stock. It's not an overall statement, but at the end of the contract, all unpaid principal. Had the language he cited to us not been crossed out of Steve's contract, I think there'd be no issue, would there? There was no reason to have that in his contract because there was no pledge of shares. That was in a paragraph that had to do with pledge of shares. That came out because Steve didn't pledge his shares. But the big difference between the Samuel agreement and Steve's agreement is Schedule B. There's a Schedule B here in which we're going to keep track of arrearages, and that gives the corporation flexibility during the 30 years because just like he said, if you had a drought and the cash basis net income's low, skip that payment, add it to the arrearages, and then go on. But there's nothing in here that says that Schedule B is not due. And then why is not the presumption then in favor of the or presumed against the drafter of the agreement? If it's not clear, then why are we presuming that that amount is not due? When there's clearly a Schedule B here that has arrearages, that has line 30, and you carry it over on line 30, and you know exactly the amount that is accrued and the principal that's unpaid on line 30, and that's due. And the contract even talks about that the principal herein due. It talks about it in paragraph 4D and in paragraph 2, but the court didn't interpret it, paragraph 1D, paragraph 2. It ignored that. It ignored the word arrearages. It ignored the word prepaid. There is a sum due, and the other thing is there, and the big difference between the Sam and Truman contract is that they have that statement in there paid in full because of the release of the shares. That's all it says. And also there's a fixed installment in the Sam and Truman contract, so therefore you have an acceleration clause if it's not paid. You couldn't have an acceleration clause when the payments are variable. You wouldn't be able to determine what was not paid. You'd have to give notice to the corporation that you didn't pay the right amount, and then you'd have to then accelerate it. It just doesn't make sense. It would be too hard to draft. So that part was stricken because the corporation was allowed the flexibility during the 30 years to reduce payments but not relieved of the responsibility to pay the arrearages. Thank you, counsel. The court will take this matter under advisement and be in recess for a few moments.